**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0078n.06
Filed: January 31, 2007

No. 05-1333

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| GEORGE MARSHALL GRACE, STEVEN T. LEBOW, and KEVIN P. PILATE, ET AL., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| CITY OF DETROIT, | ) | District of Michigan |
| | ) | |
| Defendant-Appellee. | ) | |

Before:    BOGGS, Chief Judge; BATCHELDER, Circuit Judge; and WEBER, District Judge.[*]

PER CURIAM.

This case, before the court on interlocutory appeal from the district court's order adopting in part and rejecting in part the special master's findings of fact and conclusions of law regarding damages resulting from a § 1983 class action, involves mitigation of damages. For the following reasons, we AFFIRM the decision of the district court.

**I**

---

[*]The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

1

No. 05-1333
Grace v. Detroit

On April 17, 1990, George Marshall Grace, Steven T. Lebow, and Kevin P. Pilate filed a complaint in the United States District Court for the Eastern District of Michigan under 42 U.S.C. § 1983, on behalf of a putative class comprising those who had applied for and been denied employment with the City of Detroit because of the City's pre-employment residency requirements. They alleged that the requirements violated their right to travel under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and a provision of the Michigan Constitution. They sought declaratory and injunctive relief and money damages.

The district court, on March 5, 1991, certified the action to proceed "upon behalf of a class composed of all past, present and future applicants for employment with the City of Detroit, including those who would have applied but for the City's pre-employment residency requirement(s), whose applications have since April 17, 1987, been discouraged, delayed, denied, refused or rejected on the basis of the City's pre-employment residency requirement(s)."

On cross-motions for summary judgment, the district court, in a memorandum opinion and order dated April 5, 1991, granted partial summary judgment to plaintiffs as to liability. The district court stated that the "practical effect" of the City's pre-employment residency requirements "is to impose a residency requirement of substantial duration, for the mere opportunity to compete and without any certainty of ultimate success." The district court found that the City's requirements were unconstitutional under either the strict scrutiny or rational basis tests, as violations of the fundamental constitutional right to travel, and enjoined Detroit from enforcing its pre-employment residency requirements.

2

On January 2, 1992, the district court "entered a Stipulation and Order directing that representative plaintiffs take responsibility for notifying members of the class of this Court's liability determination and the steps necessary to obtain relief." On April 9, 1992, it entered judgment of liability for those plaintiffs who had timely filed claims, and stated that further proceedings would be in the nature of postjudgment determinations of damages to be awarded to those who had filed timely claims. In May 1993, the district court appointed a special master pursuant to Fed. R. Civ. P. 53 to take evidence and issue a report and recommendation regarding the following issues:

> 1. Which members of the plaintiff class who filed timely claims are entitled to relief, as the result of the Court's finding of liability dated April 5, 1991?
> 2. With respect to each such class member found entitled to relief, what is the amount of economic damages to which he or she is entitled?
> 3. With respect to each such class member found entitled to relief, is he or she entitled to non-economic damages?

The special master eventually produced over twenty reports (and various addenda) awarding damages or nominal damages, or denying liability, to the more than five hundred claimants. Those reports and addenda were met with objections from the plaintiffs. On March 29, 2004, the special master issued a "Special Report to the Court Regarding Damages," outlining the legal principles the special master applied in making his recommendations regarding damages as to each of the class members.

In that report, the special master stated that he had found liability where a claimant "could have been successful in applying for a city position, but for the residency requirement." The special master found general congruence between the remedies afforded under Title VII cases and § 1983 cases. Citing *Suggs v. ServiceMaster Education Food Management*, 72 F.3d 1228, 1233 (6th Cir.

3

1996), and *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 840 (6th Cir. 1994)–two Title VII

unlawful discharge cases that stated that plaintiffs were presumptively entitled to backpay, with the

end date being the date of judgment–the special master stated that, under either Title VII or § 1983,

the purpose of "an award" is to make plaintiffs whole.

In exploring the issue of when liability to the various plaintiffs should end in the present case,

the special master considered the issues of mitigation. He described the seminal Title VII mitigation

of damages cases, *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982), and *Rasimas v. Michigan

Department of Mental Health*, 714 F.2d 614 (6th Cir. 1983), which laid out general rules and

principles for mitigation, and then the Sixth Circuit's decision in *United States v. City of Warren*, 138

F.3d 1083, 1098-99 (6th Cir. 1998), which held in relevant part that a Title VII claimant who was not

hired due to discriminatory employment practices was not precluded from a backpay award simply

because he did not reapply to the same employer after it eliminated its discriminatory practices.

With respect to when liability should end as to the plaintiffs in the present case, the special

master explained that he had determined liability and when that liability should end for each of the

hundreds of claimants. He noted that most but not all of the claimants in this case had sought police

or fire positions with the City. He stated that, while the district court's injunction in the case issued

on April 5, 1991, he assumed that not all members of the class would have heard about it then, despite

the injunction having been in the news. The special master continued:

> By direction of the court, claim forms were published in local newspapers.
> Included in those claim forms were the details regarding the injunction and the
> instruction that the claim forms were to be filed with the court by April 1, 1992.
> Other claim forms were available that did not contain the details regarding the
> injunction; these basic, one-page forms did contain the April 1, 1992 deadline for

> filing with the court. Each individual named as a claimant in this case would necessarily have had to fill out a claim form. Even if the claimant did not get their [sic] form from a newspaper, an individual who filled out a claim form maintaining an action against the city for a constitutional violation would be put on notice that the specified hiring practice was no longer sanctioned and thus not in practice by the City. Either way it would therefore seem that by the time an individual filed a written claim, that individual had knowledge of the injunction by April 1, 1992.

Detailing the police department's hiring practices during the period in question (and stating that the principles therein discussed applied to his decisions concerning applicants to the City's other departments), the special master noted that the police department had a hiring moratorium in place in 1992 and that it did not have an academy class from 1989 until February 1993; while an application would be placed in a processing queue when received during that period, the circumstances would have deterred many from reapplying even if they did know about the injunction.

The special master proceeded to apply the Sixth Circuit's *Rasimas* mitigation test to the questions in this case concerning the City's liability (and dates thereof) to police officer applicants rejected under the pre-employment residency requirement. In *Rasimas*, citing *Ford Motor*, we stated that the duty to mitigate "has ancient origins, and operates to prevent claimants from recovering for damages which they could have avoided through reasonable diligence." 714 F.2d at 623. We added that a finding that a claimant had exercised reasonable diligence in seeking other suitable employment after discriminatory discharge is an issue of fact, reviewable on appeal under the "clearly erroneous" standard of Fed. R. Civ. P. 52(a). *Ibid.* We stated:

> Once a claimant establishes a prima facie case and presents evidence on the issue of damages, the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence shifts to the defendant. The Defendant may satisfy his burden only if he establishes that: 1) there were substantially equivalent

5

positions which were available; and 2) the claimant failed to use reasonable care and diligence in seeking such positions.

*Id*. at 623-24 (internal citations omitted).

Elaborating on that test, we stated, with respect to the first part of the test:

We hold that the substantial equivalent of the position from which the claimant was discriminatorily terminated must afford the claimant virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status. *See* [*Ford Motor*, 458 U.S. at 231-32] ("Although the un- or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied."); *McCann Steel Co. v. NLRB*, 570 F.2d 652, 655 (6th Cir. 1978) ("We believe that substantially equivalent employment refers to the hours worked . . . as well as the nature of the work there.") . . . .

*Rasimas*, 714 F.2d at 624. Regarding the second part of the test, the we added:

A claimant is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence. The claimant's burden is not onerous, and does not require him to be successful in mitigation. The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual characteristics of the claimant and the job market.

*Ibid*. (internal citations omitted).

The special master noted that the Detroit Police Department is the largest employer of police officers in the state and thus has the ability to hire relatively larger numbers than other jurisdictions, and that "although the pay is generally higher in smaller outlying cities and townships, the Detroit department does not require a college degree and the opportunity for a variety of specialties and advancement is unparalleled [with the Detroit PD]." The special master also stated that although other police departments were hiring during Detroit's police hiring moratorium, "the prospect of obtaining a police position in adjacent cities was drastically reduced based on the additional

requirement of a degree and the minimal number of officers hired." The special master, pointing to the "virtually identical" language used in *Rasimas*, arrived at the conclusion that, under the circumstances here, the only employment substantially equivalent to being a Detroit police officer is being a Detroit police officer, and thus "only when the Detroit Police Department was hiring again in 1993 would substantially equivalent positions be available."

In October 1993, the Detroit Police Department sent by uncertified mail letters "inviting people" to take the Michigan Law Enforcement Officer Training Council (MLEOTC) test (both a physical and written test), the passing of which is a requirement for employment, in an attempt "to mitigate." The special master declared that those who did not take the exam by October 1993 had "lost interest" in Detroit positions, and–because in his analysis Detroit Police Department work was unique, with no substantially equivalent position–they therefore failed the second part of the *Rasimas* mitigation test, i.e., failure to use reasonable care and diligence in seeking equivalent positions as of that time. While claimants would most likely have had notice of the injunction by April 1, 1992, the special master reasoned that by October 1, 1993, they would have known that the injunction had issued and that the department was hiring, whether as a result of receiving the letter or by their own inquiries. As such, according to the special master, an individual who applied to other departments–which had smaller "hiring ability and more stringent requirements"–without reapplying to Detroit would be deemed not to have been reasonable in attempting to mitigate damages, and "liability will be cut off as of October 1, 1993." The same rule would obtain where individuals did not apply to any other police departments, or where they received the October 1993 letter from the Detroit Police Department and did not reapply.

7

The special master then applied to his analysis an "exception" that he derived from *United States v. City of Warren*. In that case, discussed more fully below, we held that an applicant to the City of Warren's police department who had not been allowed to apply on the basis of a preapplication residency requirement that violated Title VII because of disparate impact on black citizens, and who subsequently joined the Detroit Police Department, did not fail to mitigate his damages when he did not reapply with the City of Warren Police Department once the residency requirement had been eliminated. 138 F.3d at 1091, 1098. In so ruling, the *City of Warren* court found that the claimant's work as a police officer in Detroit was "comparable employment" to work as a police officer in the City of Warren.

The special master stated that, as a consequence of *City of Warren*,

> if an individual has been hired in as a police officer at another department [i.e., not Detroit], this will be seen by this Special Master as fulfilling the duty to mitigate and liability will not be terminated. . . . [T]he duty to mitigate only mandates that a claimant find a comparable position[;] once a position has been found, analogous to the Sixth Circuit's ruling in *Warren*, there is no requirement that a claimant come back to the employer who rejected their application due to an unconstitutional practice.

The special master did note that different considerations would come into play in cases where the claimant only received part-time or reserve work with other police departments. And the special master recognized that "[i]n other cases nominal damages would be appropriate, when, as a practical matter, a claimant earned more in another department than he or she would have earned as a Detroit police officer." Where the special master found no damages to the applicant caused by Detroit's preapplication residency requirement, e.g., when an individual made more money than he would have in the Detroit job, he recommended that only nominal damages of one dollar be awarded. *Ibid*.

8

The special master also noted that he applied the same *Rasimas* analysis regarding the Detroit Police Department to the other departments, so that, for example, the only substantially equivalent employment to work with the Detroit Fire Department was work with the Detroit Fire Department, because the Detroit Fire Department was bigger than others in Michigan and generally had lower entry requirements than suburban departments. He applied cut-off dates by which individuals had to reapply or else not be considered to have mitigated damages depending on when the department in question was hiring, when the applicants would have known about it, and so on, also taking into account the chances of being hired.

The City of Detroit did not object to the special master's various reports or his special report on how he arrived at his conclusions. The plaintiff filed objections to the special master's findings of fact and law concerning thirty-seven of the more than five hundred claimants. The objections to twenty-nine of those thirty-seven dealt, as the district court noted, "with the issues of mitigation of damages and the liability cut-off date." Those are the plaintiffs and issues before us on this interlocutory appeal.

In reviewing the special master's report in a memorandum opinion and order of October 20, 2004, the district court found that, as the parties agreed, the law of mitigation of damages is determined in this circuit by the Supreme Court's decision in *Ford Motor* and the Sixth Circuit's opinions in *Rasimas* and *City of Warren*. The district court agreed with the special master's reading of *Ford Motor* and of *Rasimas*, but disagreed with his interpretation of *City of Warren*, as to how those decisions applied "to this case of true first impression in this circuit."

The district court adopted the special master's application of the *Rasimas* two-part mitigation test to this case to the extent that the only substantially equivalent positions to Detroit police or fire employment were those positions, and thus that a) substantially equivalent positions for disappointed applicants to those departments did not exist until after the requirement had been lifted and those departments hired again; and b) once that occurred, those applicants had to reapply in order to mitigate damages.

The court further adopted the special master's application to this case of what the district court called "the 'loss of interest' doctrine," agreeing with the special master that if an applicant did not reapply with Detroit, that would constitute a failure to mitigate, and liability would be tolled as of the relevant date established for the circumstances of the particular department.

With respect to *City of Warren*, the district court stated that in that case the preapplication residency requirement constituted disparate impact race discrimination under Title VII, and that the present case was not a Title VII or race discrimination case; the district court held that "*Warren* should be read narrowly and stands for the proposition that Title VII discriminatees are not required to return to the discriminatory employer to reapply for a position in order to mitigate damages once a comparable position is obtained." The court found that applying *City of Warren* in this context "would result in inequitable results." The district court made that determination on the following grounds:

> Title VII discriminatees are not required to reapply with the discriminatory employer in order to mitigate damages because of the nature of the racially invidious discrimination. Whereas here, where the discrimination was based solely on a geographical requirement and not an inherently personal trait such as race or religion,

10

it is not unreasonable to require each claimant to return to the employer who discriminated against them.

Plaintiffs moved to have the district court certify an interlocutory appeal under 28 U.S.C. § 1292(b).  The motion stated that the controlling question of law presented by the district court's order that should be reviewed on interlocutory appeal is "whether claimants who have been denied employment on the basis of the City of Detroit's pre-employment residency requirement(s) are properly denied damages if they failed to reapply for employment with the City, once the pre-employment residency requirement(s) were enjoined."

The district court granted the motion, explaining that its October 18, 2004, opinion and order involved a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the litigation.  At the same time, it issued an order of reference to the special master for additional proceedings, which indicated that the interlocutory appeal concerned the "mitigation of damages" issue, and which directed the special master to make alternative recommendations for claimants affected by its order and the interlocutory appeal: first, based upon its order, and second, on the assumption that the plaintiffs would win on this appeal.

We granted the petition for permission to appeal.

**II**

**A**

The plaintiffs urge that this interlocutory appeal does not challenge findings of fact but instead challenges "the purely legal issue of the District Court's interpretation of the mitigation doctrine," and that the standard of review is de novo.

In 2001, we held:

> Because this is an interlocutory appeal, we have no authority to review the district court's findings of fact, but must confine our review to pure questions of law. *See Foster Wheeler Energy Corp. v. Metro*[.] *Knox Solid Waste Auth., Inc.*[,] 970 F.2d 199, 202 (6th Cir. 1992). We review the district court's conclusions of law de novo. *Barnes v. Winchell*, 105 F.3d 1111, 1115 (6th Cir. 1997).

*Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1023 (6th Cir. 2001).

Thus, we review de novo the question of whether the relevant holding in *City of Warren*–that the plaintiff did not have to reapply to the Warren Police Department after Warren had ceased discriminating in order to mitigate damages–applies in this case. Generally, whether a claimant has mitigated damages, however, is an issue of fact. *City of Warren*, 138 F.3d at 1098 n.13. *See also Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006); *Rasimas*, 714 F.3d at 623. The district court's finding that the only substantial equivalent of employment with the Detroit departments is employment with the Detroit departments–which the plaintiffs vigorously contest–is a finding of fact, and we do not review it on interlocutory appeal.[1]

---

[1]In *City of Warren*, the Title VII case the plaintiffs here assert means that they did not have to reapply with Detroit, and that the district court and Detroit claim is not applicable, the Sixth Circuit stated that

> [g]enerally, on appeal the mitigation of damages is an issue of fact subject to the clearly erroneous standard of review. *See Rasimas*, 714 F.2d at 623. However, in this case, we are not examining the factual circumstances of Fears's mitigation. Rather, we are determining whether the district court should have awarded back pay

**B**

In *Carey v. Piphus*, 435 U.S. 247 (1978), the Supreme Court made clear that compensation for actual injuries suffered is the basis for compensatory damages under § 1983; without actual injury, nominal damages may be awarded. *See also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). In *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994), we stated that plaintiffs seeking damages under § 1983 have a duty to mitigate, and in making that statement imported mitigation doctrine from this circuit's seminal Title VII mitigation case, *Rasimas*:

> In a § 1983 case the plaintiff has a duty to mitigate damages. *See Rolfe v. County Bd. of Educ.*, 391 F.2d 77, 81 (6th Cir. 1968). . . . *Rasimas* unequivocally establishes that once the plaintiff has presented evidence of damages, the defendant has the burden of establishing a failure to properly mitigate damages. [*Rasimas*, 714 F.2d] at 623-24. To satisfy this burden the defendant must establish that substantially equivalent positions were available and that the plaintiff failed to exercise reasonable care and diligence in seeking those positions. *Id*. at 624.

Courts have generally treated remedies under § 1983 and Title VII as comparable. *See Squires v. Bonser*, 54 F.3d 168, 172 (3d Cir. 1995).

The plaintiffs contest the district court's limitation of the mitigation principles stated by this court in *City of Warren*. In that case, the United States brought suit against the City of Warren, alleging, in relevant part, that its pre-application residency requirement resulted in disparate impact against blacks under Title VII. Joseph Fears attempted to apply for a position with the Warren Police Department in 1979, was not allowed to apply on the basis of the pre-application residency

---

despite Fears's delay in reapplying for the position. . . . the award and calculation of back pay is subject to review for an abuse of discretion. *See Wilson Metal Casket Co.*, 24 F.3d at 840.

*City of Warren*, 138 F.3d at 1098 n.13.

requirement, and subsequently worked as a Detroit police officer from 1985 to 1990, at which point he was terminated for misconduct. The district court awarded Fears back pay with a cut-off date of the time he was terminated from the Detroit Police Department, which the United States did not contest. 138 F.3d at 1091, 1098.

Warren argued that the district court abused its discretion in awarding back pay, because Fears waited until 1991, seven years after Warren eliminated the residency requirement for police applicants, to reapply with the Warren Police Department, which Warren asserted constituted a failure to mitigate damages.[2] *Id*. at 1098. We stated:

> In an apparent case of first impression, Warren asks us to consider whether a Title VII claimant who was never hired because of discriminatory employment practices is precluded from a backpay award because he did not reapply for work with the same employer when it eliminated its discriminatory practices. The district court found that Fears's failure to reapply to the City of Warren did not equal a failure to mitigate damages, and therefore, did not preclude his back pay award. We affirm the district court's decision.
>
> A Title VII claimant has a duty to mitigate damages by seeking substantially equivalent employment. . . . In this case, Fears worked as an officer with the Detroit Police department from July 1985 to November 1990. He therefore found and pursued employment comparable to that he would have enjoyed with the City of Warren absent discrimination. Thus, Fears's work as a Detroit police officer satisfies Title VII's requirement that he mitigate his damages.
>
> Warren asks us to reach the inequitable conclusion that Fears should have been aware of the City's elimination of its residency requirement for police applicants in

---

[2]Warren eliminated its "residency requirement" for police and firefighters following a 1984 Michigan Court of Appeals ruling that the requirement violated applicants' constitutional right to travel. 138 F.3d at 1088 n.1. The United States filed suit under Title VII in 1986 in the case that led to the *City of Warren* decision by this court, alleging a pattern or practice of discrimination on the basis of race and citing the city's preapplication residency requirement and its recruitment practices. In 1991, the district court held that the "preapplication residency requirement" violated Title VII. *Id*. at 1088-89. Thus, unlike in this case, the event that Warren alleged should have triggered Fears's duty to reapply in order to mitigate damages–the elimination of the residency requirement–did not come about as a result of the litigation in the federal district court. (It had already occurred.)

14

> 1984 and he was therefore obligated to reapply to the Warren police force after he had been working in Detroit. We decline to reach this result. No established authority requires Title VII claimants who have found comparable employment to reapply for positions with employers who have previously refused to hire them for discriminatory reasons. This is simply not a hoop Title VII requires claimants to jump through, and we will not be the first to require it.

138 F.3d at 1098. The plaintiffs here argue that the mitigation principle in *City of Warren* is directly on point and should apply here, and that the district court erred in limiting its applicability only in Title VII cases involving an "inherently personal trait."

Detroit counters that the district court's interpretation should be adopted, and points to *Nagarajan v. Tennessee State University*, No. 98-5169, 1999 WL 551360 (6th Cir. July 19, 1999) (unpublished), as an illustration of the logic that underlies limiting the *City of Warren* principle to Title VII cases. In *Nagarajan*, a Title VII case, the employer was found to have discriminated against the plaintiff, a former tenure-track associate professor, by denying him tenure and promotion on the basis of national origin. The plaintiff was awarded reinstatement, back pay, and other damages. Nagarajan had been rejected twice for tenure and then secured an attorney who wrote to the employer. The employer then invited him to reapply for tenure; after Nagarajan filed a charge with the EEOC, the employer again invited Nagarajan to reapply for tenure. 1999 WL 551360 at *1-2. The Sixth Circuit, reviewing the district court's determination of reasonable diligence (from the *Rasimas* test) for clear error and stating that it would only overturn a grant or denial of back pay upon abuse of discretion, held that the district court did not clearly err when it found that Nagarajan had reasonably refused to reapply for tenure and that he had otherwise mitigated his damages by engaging in an extensive job search. Nagarajan did not fail to mitigate when he did not reapply, as he believed it was futile based on his prior experience, and "was justifiably skeptical about the promotion and tenure

15

application process due to the substantial discrimination he witnessed throughout his previous application proceedings." *Id*. at *3, *4. The Sixth Circuit stated that "[w]e therefore conclude that the plaintiff had a reasonable basis for believing that he would not ever be treated fairly in the promotion and tenure application process at TSU." *Id*. at *4.

In this case, the special master and district court found, in applying the first part of the *Rasimas* mitigation test, that the only positions substantially equivalent to those with Detroit were those with Detroit. The plaintiffs attack this determination. This finding of fact is not duplicated in any other relevant case, but it is a question of fact, and thus not reviewable on interlocutory appeal. It is not antithetical to existing precedent. Having made that determination, the special master and district court then concluded, following the second part of the *Rasimas* test, that the plaintiffs were obliged to have reapplied with Detroit in order to have exercised reasonable care and diligence in seeking substantially equivalent positions. In most respects, that determination actually cuts in favor of the plaintiffs, as it allows them to collect back pay until the time they reapplied (or should have, according to the special master/district court), rather than simply the time they secured some employment.

The question then becomes whether *City of Warren* means that these plaintiffs, especially those who applied for police positions, did not have to reapply for the jobs in order to mitigate damages. We think that it does not. That case found that employment with the Detroit Police Department was comparable to employment with the Warren Police Department under those circumstances; the district court here found that work for Detroit was unique. Furthermore, the language of *Warren* suggests that its rule that the plaintiff did not have to reapply in order to mitigate

damages was based at least in part on the fact of invidious (in that case, racial) discrimination on the part of the defendant: "No established authority requires Title VII claimants who have found comparable employment to reapply for positions with employers who have previously refused to hire them *for discriminatory reasons.*" *City of Warren*, 138 F.3d at 1098 (emphasis added). That same logic was used explicitly in *Nagarajan*, as discussed above. In this case, which does not involve a claim of racial discrimination, there is much less reason to find odious a rule that a plaintiff must reapply with the defendant once the offending policy is removed. We acknowledge, however, that the circumstances and lower-court findings in this case are most unusual. We limit the ruling that the plaintiffs must have reapplied to the defendant in order to have satisfied their duty to mitigate damages to the facts of this case.

## C

The plaintiffs also challenge the district court's determination that the Supreme Court's ruling in *Ford Motor* does not mean that an employer must give a claimant an unconditional offer of employment in order to stop back pay liability, and that an employer's invitation to a claimant to reapply for a position *can* under some circumstances stop liability. We need not reach that issue, however, because the focus of this case is not what the defendant was or was not required to do in order to toll liability, but rather what the plaintiffs did or did not have to do, under the circumstances, to mitigate damages. On that issue, we find that the district court did not err in determining that the plaintiffs were required to reapply with Detroit in order to mitigate damages, in light of its finding that employment with Detroit was unique, and the nature of the constitutional violation established.

For the foregoing reasons, we AFFIRM the decision of the district court.

No. 05-1333
Grace v. Detroit